**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ORLANDO RICARDO WILLIAMS | : | No. 377 WDA 2024 |

Appeal from the PCRA Order Entered March 28, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009866-2016

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: SEPTEMBER 24, 2025**

The Commonwealth appeals from the order granting the Post Conviction

Relief Act ("PCRA")[1] petition filed by Orlando Ricardo Williams ("Williams") and

awarding him a new trial.  We reverse.

This Court previously summarized the factual background of this case,

based off the evidence at Williams' non-jury trial:

> [O]n June 20, 2016, [eight–year-old] J.S., was admitted into the
> hospital with fatal injuries.  The day before had been Father's Day
> and the family spent the day at [a state park] and visited [the
> maternal grandmother at a nearby campground].  J.S. was fine all
> day, laughing, running, playing, and eating pizza.  They left for
> home between 11:00 p.m. and midnight.  Aliehsa Lininger, J.S.'s
> mother (hereinafter "Mother")[,] drove the family home and the
> victim slept on the way home.  [Williams] was Mother's boyfriend
> and had lived with the family since 2011.  He was the biological

---

[1] **See** 42 Pa.C.S.A §§ 9541-9546.

father of the youngest child, Z.P., but not [of] the victim or [Mother's thirteen-year-old son, S.S.].

The family arrived home about 1:30 a.m. J.S. fell asleep at the table after they were home and Mother told him to go to his room, but first take out the garbage. J.S. was not injured at this point. As J.S. walked towards the front door with the garbage, [Williams] punched him in the chest for attempting to take the garbage out the front door rather than the back door. The punch caused J.S.'s head to hit the wall. Mother testified that [Williams] would physically discipline the children using a belt, paddle, or other items. After the punch, J.S. took out the garbage and then went upstairs. J.S. had no trouble walking or going upstairs after the punch and did not seem abnormal, so this punch could not have been the cause of the fatal injuries.

Mother and S.S. left shortly after that, around 1:30 a.m., for Mother's nighttime commercial cleaning job. S.S. went with Mother to help her clean many nights, including that night. While they were away [Williams] was left at home to care for J.S. and Z.P., his younger brother. Mother and S.S. returned from their job between 2:30 a.m. and 3:30 a.m. They had been away from the house between one and two hours.

Soon after they returned home from work, S.S. went to his room and [found] J.S. sleeping in his bed. [Mother testified that it was not "common" for J.S. to sleep in S.S.'s bedroom when S.S. was not there. N.T., 11/28/17, at 69, 95.] S.S. moved J.S. to the floor, placing a pillow underneath his head. S.S. noticed that J.S.'s clothes were wet. He was concerned about J.S.'s unusually loud snoring and went downstairs and told Mother, who did not check on J.S. S.S. did not see J.S. again because when he returned to his [room] J.S. was gone. [Williams] had been upstairs with the opportunity to move J.S. from the floor into J.S.'s bed.

It is important to note that J.S.'s clothes were wet when S.S. moved him to the floor. [Williams] told Detective Anthony Perry [("Detective Perry")] as he showed the detective around the house, that he threw water on J.S. to try to wake him up. He also told this to Detective Daniel Goughnour at the McKeesport hospital. He said that he found J.S. unconscious in his bedroom at approximately 3:30 a.m. and he threw water on J.S. to try to wake him up. [Williams] was not in custody when [he] made these statements.

A few hours after Mother went to sleep, before 6:00 a.m., [Williams] came down carrying J.S. and said they had to take him to the hospital. They took J.S. to McKeesport Hospital and from there J.S. was transferred to Children's Hospital [of Pittsburgh].

Dr. Jennifer Clarke [("Dr. Clarke")], a pediatrician at the Child Advocacy Center at Children's Hospital, testified about J.S.'s condition. She testified that he was admitted about 6 a.m. in critical condition. She said he "essentially presented as dead." [N.T., 11/29/17, at 255.] The victim "had a large subdural hemorrhage with mass effect and herniation which [caused] his fatal injury." [*Id*. at 258.] J.S. had a large bleed in his brain. Dr. Clarke explained what had happened to J.S.:

> So subdural hemorrhages — basically there are veins inside the head, in the brain. When they get torn or avulsed, they bleed, and that collection is your subdural hemorrhage. When they get large — when they get very large, that collection, there can be mass effect on the brain. So the skull is basically an enclosed space, so if there's something bleeding in there, there's nowhere for that brain — the brain gets compressed and eventually needs to go somewhere, and so that somewhere is your neck, and that's what you call herniation, when the brain goes down towards your neck, and that causes death.

[*Id*. at 259.] [According to Dr. Clarke, t]he subdural hemorrhage was caused by repetitive significant and severe acceleration-deceleration forces to J.S.'s head. Multiple forward and backward movements plus impact caused the fatal brain injury. The repetitive impact was severe enough [to] have avulsed the veins. Dr. Clarke testified that "There was also bruising to the front part of the brain so again signifying that there was a lot of forces that acted on his brain to be shaken in his skull." [*Id*. at 275.] A single impact would not have caused the subdural bleeding. There were abrasions, bruising and swelling on his forehead and multiple bruises on his neck that were not caused by medical care. J.S. did not have any preexisting medical issues that would explain his brain injury. Dr. Clarke's diagnosis was that the fatal brain injury was caused by child abuse.

The injuries to his brain were so severe that he would have become symptomatic immediately afterwards, but not necessarily immediately incapacitated, perhaps losing consciousness,

showing lethargy, headaches, or vomiting. He would not have seemed normal after the brain injury occurred.

Dr. Todd Luckasevic [("Dr. Luckasevic")], a forensic pathologist [and] Associate Medical Examiner for Allegheny County Medical Examiner's Office testified about the autopsy he performed on J.S. His findings were consistent with Dr. Clark[e]'s conclusions. At the time of the autopsy J.S. weighed 51 pounds and his height was 48 inches. J.S.'s head depicted multiple contusions. There was internal trauma to the head and brain. Dr. . . . Luckasevic concluded that J.S. had a large subdural hemorrhage of the brain. Dr. Luckasevic explained that the bleeding in the brain was caused by:

the head striking a blunt object or a blunt object striking the head, so in this case, again it's more like . . . a couple mechanisms that could occur would be a forceful push against the wall or a forceful push against the floor where you have a sudden stop. You have impact and a sudden stop, because we need to have a sudden stop to cause tearing of the bridging veins which causes that subdural hemorrhage. So the [skull] stops, but the brain still kind of moves in the cranial cavity, and it breaks those bridging veins which causes the hemorrhage.

[N.T., 11/29/17, at 312.] [Dr. Luckasevic opined that t]he cause of death was blunt force trauma to the head, a homicide. It was not caused by a single blow. There were injuries to the front, back, and right side of J.S.'s head. There were two major abrasions on the back of the head which could have resulted in the subdural hemorrhage. [According to Dr. Luckasevic, t]he bruising of the right side and frontal forehead definitely contributed to the subdural hemorrhage.

* * * *

Detective James Fitzgerald [("Detective Fitzgerald")] and Detective Anthony Perry [("Detective Perry")] of the Allegheny County Police Department testified as follows: On June 20, 2017, at approximately 8:30 a.m., Detective Fitzgerald was informed by his supervisor that a child was admitted to the hospital with a head injury and was in grave condition. While Detective Fitzgerald was speaking to Mother, [Williams] consented to a search of his vehicle and the house. During the vehicle search, Detective Fitzgerald discovered a plastic bag holding the clothes that J.S. wore to the hospital and noted that the clothes "were . . . moist [or wet]."

[N.T., 11/28/17, at 28.] Although he later changed his story, [Williams] initially admitted to Detective Perry that [Williams] attempted to wake J.S. by throwing water on him. [Williams also told Detective Perry that he intended to wake J.S. in the early morning to have him clean his room.

Due to reports regarding the severity of J.S.'s injuries, Detective Perry asked Williams to continue the interview at the county homicide office, and Williams consented. During a recorded interview, Williams stated that it was S.S., not him, who had doused J.S. with water. Williams also claimed that he was unaware how J.S. had moved to his bed from S.S.'s bedroom. Williams attributed J.S.'s injuries to J.S.'s "clums[iness]," and "heredity." N.T., 11/29/17, at 156.]

Detective Fitzgerald also conducted a search of [the family's] house. In J.S.'s bedroom, the detective observed red-brown stains on a sheet that was "consistent with blood" and a red-brown stain on the wall of the bedroom. [N.T., 11/28/17, at 35-36.] Subsequent testing revealed that the blood stains collected from the bedroom matched J.S.'s DNA. [Detective Fitzgerald did not recover any evidence from S.S.'s bedroom.]

*Commonwealth v. Williams*, 880 WDA 2018, 2019 WL 6329388, at \*\*1-3 (Pa. Super. 2019) (unpublished memorandum) (record citations omitted and some formatting altered)

The Commonwealth charged Williams with criminal homicide, endangering the welfare of children, and recklessly endangering another person. Brandon Herring, Esquire ("Trial Counsel"), represented Williams prior to and during his trial. The Honorable Donna Jo McDaniel presided over the pre-trial proceedings and Williams' non-jury trial.

Williams filed a motion to suppress the statements he made to police in the family home and at the county homicide office. Following a hearing, Judge McDaniel granted the motion in part, ruling that Williams' statements during

the recorded interview after 4:23 p.m. — when he requested an attorney — were inadmissible. *See* N.T., 6/5/17, at 46-47; *see also* Order, 6/5/17. Judge McDaniel denied the suppression motion as to Willliams' statements at the residence and during the recorded interview prior to 4:23 p.m. *See* N.T., 6/5/17, at 46-47; *see also* Order, 6/5/17.

Following the suppression ruling, Trial Counsel filed a motion to withdraw from representation of Williams. At a hearing on that motion, Williams explained that he requested the filing of the motion because Trial Counsel "made comments" that led Williams to believe that Trial Counsel "was biased against" him. N.T., 9/11/17, at 2. Williams stated that Trial Counsel informed him that Judge McDaniel would "not be fair and impartial" because she had heard the suppressed portion of the recorded interview and she "would convict [Williams] based on what [she] reviewed." *Id*. at 2-3. When Judge McDaniel informed Williams that she was "not trying the case[, t]he jury is going to try the case," Williams responded: "That is the problem. I want to go [to] trial by judge. . . . [Trial Counsel] is forcing me to go [to] trial by jury." *Id*. at 3. Judge McDaniel denied the motion, informing Williams that he had the right to waive his right to a jury trial, she had "no prejudices against" him, and she would "give [him] a fair trial." *Id*. at 4-5. Judge McDaniel further informed Williams that he could proceed before another judge who had not heard the suppressed statement. *See id*. at 3-4.

On November 28, 2017, the first day of trial, Judge McDaniel accepted Williams' waiver of his right to trial by jury. *See* N.T., 11/28/17, at 7-9. Judge

McDaniel then raised "another issue," the fact that she had heard the suppressed portion of Williams' interview with the homicide detectives. *Id*. at 9. Judge McDaniel instructed Williams that "if [he] wish[ed] to do so [his case] would be heard in front of a judge who did not hear the entire statement." *Id*. at 10. After conferring with Trial Counsel, Williams elected to proceed before Judge McDaniel. *See id*. Judge McDaniel next addressed the Commonwealth's notice of its intent to present, pursuant to Pa.R.E. 404(b), other bad acts evidence related to Williams' prior physical abuse of Mother and the three children. After oral argument, Judge McDaniel granted the Commonwealth's request to admit evidence of Williams' abuse of Mother and S.S. but not evidence related to abuse of J.S. or Z.P. *See id*. at 11-14. The Commonwealth then began the presentation of its case.

The following day, Judge McDaniel conducted an *in camera* competency hearing to assess whether then-fourteen-year-old S.S.'s testimony was tainted by conversations with Mother or other family members. We provide a detailed review of the competency hearing and the ensuing *in camera* proceeding as they are at the heart of the Commonwealth's first appellate issue. At the outset of the competency hearing, Judge McDaniel asked S.S. "[w]hat happened to [his] head" and whether his new hairstyle was "on purpose." N.T., 11/29/17, at 113. After S.S. explained his hairstyle, Judge McDaniel responded that she thought "it looks okay." *Id*. Judge McDaniel then stated that she would call S.S. by his nickname, as she understood he "like[d the nickname] better." *Id*. After S.S. responded that he had not "been

- 7 -

called that for a long time," Judge McDaniel stated that she would "call [him S.S.] then." *Id*. at 114.

After the prosecutor and Trial Counsel examined S.S., Trial Counsel indicated that he was "satisfied" that there was no taint that should preclude S.S.'s testimony. *Id*. at 117. Judge McDaniel then informed S.S. that they were "looking to put [him] on next, so [he would] be first." *Id*. The prosecutor indicated that S.S. was in fact the third witness that day, which prompted Judge McDaniel to ask S.S. whether that was "okay" with him. *Id*. S.S. responded in the affirmative. *See id*.

At this point in the proceeding, S.S.'s aunt, who was present at the *in camera* hearing, asked Judge McDaniel whether she could "[s]ay something" to S.S. *Id*. Judge McDaniel responded in the affirmative, and the aunt stated the following: "I don't want you looking at [Williams]. Other than that, that's the only thing I'm going to tell you. Okay? I'll be sitting in there. Don't even look at him." *Id*. After this exchange, Judge McDaniel stated to S.S.:

> THE COURT: . . . You can do this, bub.
>
> * * * *
>
> THE COURT: [S.S.], I know you're a little bit nervous, but there will be a policeman in the room watching . . . Williams, so you don't have to worry about anything.

*Id*. at 118. Judge McDaniel then directed S.S. to retrieve "a piece of chocolate" in a "gold bag" on her desk with "his name on it." *Id*. at 119. She also informed S.S. that he could use her chambers while he waited to testify.

*See id*. at 119; *see also id*. at 216 (Judge McDaniel directing S.S. and his aunt to enter chambers during a break in his testimony).

S.S. and his aunt then exited chambers to allow counsel and Judge McDaniel to discuss further matters. Trial Counsel informed the court that Williams' mother provided him with a thumb drive that morning allegedly containing a video recording of J.S. stating "that he was sexually abused by" S.S. *Id*. at 120. The following exchange then occurred:

> [Trial Counsel:] . . . During . . . Williams' taped statement, . . . he expressed hesitation about providing his cellular telephone to the police because of recordings related to sexual abuse between [S.S.] and other members of the family. I intended to cross-examine [S.S.] on that subject because I think it goes to bias and potential motive to harm [J.S.], but I wanted to get a ruling on that before we did it.
>
> THE COURT: Pardon?
>
> [Trial Counsel]: Well, Your Honor, the argument —
>
> THE COURT: You think [S.S.] did this to [J.S.]?
>
> [Trial Counsel]: Well, he would be a potential person who could have inflicted the injury, and . . . he had a rap book, he calls it, [containing] statements within it I would intend to introduce into evidence where he takes responsibility for not being a good brother and feels responsible for harming [J.S.[2]] So I would say that sexual abuse could go along with what he is suggesting in those statements.

*Id*. at 121-22.

_____

[2] S.S. testified that he kept a notebook of rap lyrics; in one of these raps, he expressed that he could have been a better brother to J.S. and that he felt responsible for J.S.'s death because medical personnel discovered bruising on J.S.'s abdomen, which he caused during a wrestling match two days prior to J.S.'s death. *See* N.T., 11/29/17, at 203-07.

The Commonwealth objected to cross-examination of S.S. regarding sexual abuse of J.S., and Trial Counsel reiterated his position that if "Williams was aware of this abuse that had occurred, it would be a potential motivation for [S.S.] to testify against him and it would go to bias." *Id*. at 123. Judge McDaniel responded:

> I don't think so. I think we're just going to — unless it specifically says that, you know, "I sexually abused [J.S.], and [Williams] knew about it" . . . you know, it's a big jump, and it's pretty clear from what we've heard thus far that [S.S.] was not the abuser or was not the perpetrator of this crime. I mean, I haven't heard anything that points to that yet. I may, but I just — I just don't know how I could possibly hurt this kid again, and if I'm wrong, I'm wrong, and somebody else will retry the case.

*Id*. Judge McDaniel then stated her ruling that Trial Counsel could ask S.S. regarding "what he meant by . . . 'I'm not a good brother, and I've hurt my brother'" or whether there was "any other kind of harm that [S.S.] caused to [J.S.] without specifically" using "the term 'sexual abuse'" "because there's no evidence of it." *Id*. at 123-24. Trial Counsel agreed that sexual abuse was "kind of a loaded term anyway." *Id*. at 124.

On cross-examination, S.S. admitted that he told police that he punched J.S. two days before his death, which left a bruise on J.S.'s body. *See id*. at 211. Trial Counsel asked S.S. whether he had "ever harmed [J.S.] in any other way other than punching." *Id*. S.S. stated that he had not. *See id*. Trial Counsel then asked S.S. whether he "ever wanted to harm [J.S.] in any other way other than punching." *Id*. at 212. The Commonwealth objected on relevance grounds, and Judge McDaniel sustained the objection. *See id*.

After the Commonwealth concluded its case, the prosecutor raised at a sidebar the issue of whether Williams intended to present the alleged video recording of J.S. accusing S.S. of sexually abusing him. *See* N.T., 11/30/17, at 313. Trial Counsel stated he attempted to open the thumb drive containing the recording on four different computers but was unable to view its contents. *See id*. The Commonwealth rested, and the defense did not present any evidence. During closing arguments, Trial Counsel argued that, while it was not "the most likely possibility," the facts of S.S.'s presence in the home and his admission of previously "having caused harm to" J.S. did not "prevent [S.S.] from being considered as a suspect in causing the injury" to J.S. *Id*. at 319-20.

On December 4, 2017, Judge McDaniel found Williams guilty of first-degree murder, endangering the welfare of children, and recklessly endangering another person. On that same date, Judge McDaniel imposed a sentence of life imprisonment without parole. Trial Counsel filed a timely post-sentence motion, in which he raised numerous issues, including a claim that Judge McDaniel erred by failing to recuse herself after hearing Williams' suppressed statement to police, "which could be characterized as an admission of culpability." Post-Sentence Motion, 12/12/17, at ¶ 14. Trial Counsel also requested that he be permitted to withdraw due to Williams' previous claims that he provided ineffective assistance of counsel. *See id*. at ¶¶ 15-16. Judge McDaniel granted the request to withdraw, appointed new counsel, and subsequently denied the post-sentence motion.

Williams, through new appellate counsel, filed a notice of appeal. In her Pa.R.A.P. 1925(a) opinion for the direct appeal, Judge McDaniel addressed the claim that she erred by failing to recuse, stating that she was "impartial, without bias or prejudice and . . . did not consider the suppressed evidence." Trial Court Opinion, 1/22/19, at 9 (unnumbered). Williams did not argue the recusal issue on appeal, but, as relevant here, he did raise a claim that the evidence at trial was insufficient to prove first-degree murder because he lacked the specific intent to kill. *See Commonwealth v. Newton*, 318 A.3d 133, 139 (Pa. Super. 2024) (providing that, to sustain a conviction for first-degree murder, the Commonwealth must prove, *inter alia*, that the accused acted with specific intent to kill). We rejected this appellate claim, reasoning that the evidence that Williams "inflicted blunt force trauma to J.S.'s head, a vital organ, by striking it against a hard flat surface multiple times" and "then waited several hours to seek medical attention for" J.S. was sufficient to prove beyond a reasonable doubt that Williams had the specific intent to kill. *See Williams*, 2019 WL 6329388, at *10. Williams filed a petition for allowance of appeal, which our Supreme Court denied on June 2, 2020. *See Commonwealth v. Williams*, 235 A.3d 273 (Pa. 2020).

On August 27, 2021, Williams filed a counseled, timely first PCRA petition. Williams filed two amendments to his petition. As relevant here, Williams argued that Trial Counsel provided ineffective assistance by failing to object or move for a mistrial or recusal due to Judge McDaniel's history of

"bias[] against defendants in cases of domestic abuse"[3] and her "affectionate solicitation" of S.S. and "demonization" of Williams at the competency hearing. PCRA Petition, 8/27/21, at 20, 26. In addition, Williams claimed that Trial Counsel was ineffective for failing to retain a medical expert to challenge the Commonwealth's "dubious theor[ies]" that Williams delayed taking J.S. to the hospital by more than three hours after causing the injuries and that J.S.'s "injuries were caused by multiple accelerations and decelerations." *Id*. at 60 (unnecessary capitalization omitted).[4]

The Honorable Anthony M. Mariani presided over the hearing on Williams' PCRA petition.[5] Williams first called Jonathan L. Arden, M.D. ("Dr. Arden"), an expert in forensic pathology. Dr. Arden testified that the evidence was inconsistent with the Commonwealth's experts' theory that Williams caused J.S.'s significant brain injuries in the child's room and J.S. then walked into S.S.'s room, where S.S. found him laying on his bed after returning home from Mother's cleaning job. *See* N.T., 3/28/24, at 15-16. Dr. Arden explained that "had [J.S.] been so severely injured in his own room . . . that he would

---

[3] In ***Commonwealth v. McCauley***, 199 A.3d 947 (Pa. Super. 2018), this Court noted that Judge McDaniel exhibited a pattern of "biased decision-making . . . and inability to impose individualized sentences for" individuals who commit sexual offenses against child victims in that case and two prior cases. ***Id***. at 951.

[4] Williams raised additional claims related to ineffective assistance of his direct appeal counsel concerning the bias issue and the Commonwealth's failure to turn over exculpatory information regarding Mother. Williams abandoned these claims at the PCRA hearing.

[5] Judge McDaniel retired from the bench in 2019.

not have been able to climb stairs shortly thereafter [as the Commonwealth's experts opined,] he similarly would not [have been] able to ambulate from room to room." *Id*. at 16. Dr. Arden further stated that "if [J.S.] could ambulate to the [S.S.'s] room, [he] would then expect him to still be leaving evidence of his condition, in particular, the blood and vomit, as was indeed found in his own room." *Id*. Dr. Arden testified that, because "the effect of a subdural hematoma becomes increasingly worse," he was more than likely to vomit and bleed in S.S.'s room. *Id*. at 26, 31.

Dr. Arden opined:

[I]t is much more likely that the injury occurred much closer in time to the time when he was discovered then taken to the hospital. He had a large acute subdural hemorrhage or hematoma that had compressed and shifted his brain, which was the mechanism by which he was in such severe condition that ultimately resulted in his death, and that [injury] more likely would have accumulated rapidly over a period of minutes, a half an hour, maybe even an hour[,] consistent with a more rapidly progressing process, not one that took hours.

*Id*. at 17-18. Dr. Arden stated that "it would have been noticeable or visible . . . to an observer that this child was not normal," which was inconsistent with the observation of Mother and S.S. that J.S. appeared to be sleeping. *Id*. at 18-19. Dr. Arden testified that there was "no reason that" then-thirteen-year-old S.S. "could not have inflicted the[] injuries" on J.S., who "was a small eight-year old." *Id*. at 19-20.

Dr. Arden further called into question Commonwealth expert "Dr. Clarke's testimony about rapid acceleration and deceleration as one of the

mechanisms of death in this case." *Id*. at 20. Dr. Arden stated that "[t]here [was] absolutely no reason" to invoke this mechanism as the cause of J.S.'s fatal injuries, as it was "a thinly veiled attempt to invoke the shaken baby syndrome," which was "highly controversial" and "totally inapplicable to an eight-year-old child of that size." *Id*. at 20-21.

The Commonwealth then called Rachel Berger, M.D. ("Dr. Berger"), an expert in pediatrics and child abuse and a pediatrician at the UPMC Child Advocacy Center who was involved in preparing Dr. Clarke's expert report. Dr. Berger testified that J.S.'s cause of death was "abusive head trauma," which resulted from "an acceleration-deceleration-type event." *Id*. at 43, 46. Dr. Berger clarified that she "would not call this a shaken baby syndrome," but that the tearing of the veins in J.S.'s brain and retinal and optical nerve sheath hemorrhages were indicative of rapid acceleration and deceleration. *Id*. at 46-49.

Dr. Berger agreed with Dr. Arden that J.S. "would have been symptomatic immediately" after the injury, however he could have displayed "a wide range of symptoms." *Id*. at 54. Dr. Berger stated that J.S. "could have lost consciousness[,] could have been nauseous[,] could have been dizzy[,] could have stopped breathing[,]" but he would not necessarily have all these symptoms, and they likely evolved over time as the "bleeding continued and pressed on his brain." *Id*. Dr. Berger stated that "congested breathing" is one of the possible symptoms which would have sounded like an "unusual rate of breathing." *Id*. at 54-55. Dr. Berger stated that it was

possible that J.S. could have "stumbled a few steps into another room" after he sustained his injuries, but he could not have walked up or down a flight of stairs. *Id*. at 55.

Dr. Berger further testified that J.S.'s initial CT scan at McKeesport Hospital showed a "reversal sign" showing "lack of oxygen to the brain," which was evidence of a lapse in time between the injury and seeking medical treatment. *Id*. at 56-57. According to Dr. Berger, lack of oxygen to the brain is common immediately after head injuries, but "[i]t generally takes several hours for a reversal sign to be visible on a CT scan." *Id*. at 57.

Trial Counsel was the final witness at the PCRA hearing. He reviewed Judge McDaniel's conduct towards S.S. at the *in camera* competency hearing — including her comments on his appearance, referring to him by a nickname, discussing his place in the witness order, offering him chocolate, and permitting a family member to be present — which he described as "atypical and inappropriate." *Id*. at 73. Trial Counsel further indicated that "Judge McDaniel was very encouraging in her body language, as well as demeanor." *Id*. at 74. Trial Counsel recognized, however, that "in Allegheny County, it's not totally uncommon for the Judge to have some . . . banter with the child before a competency hearing to make him feel comfortable." *Id*. at 78.

Trial Counsel testified that, following Judge McDaniel's advice to S.S. to not worry about Williams because an officer would be present in the courtroom, he felt "that any cross-examination of [S.S.] was going to be totally ineffective because" Judge McDaniel appeared to have "arrive[d] at a

conclusion as to [S.S.'s] credibility." ***Id***. at 76.  When asked by Judge Mariani why he did not "raise cane [*sic*]" after Judge McDaniel appeared to preclude him from presenting a defense that S.S. was the perpetrator of J.S.'s injuries, Trial Counsel acknowledged that Williams "adamantly wished for the case to be presented at a non-jury trial" before Judge McDaniel.  ***Id***. at 89.

Trial Counsel stated that he "discussed the issue of proceeding to a non-jury trial in front of Judge McDaniel at length" prior to trial.  ***Id***. at 98. However, Williams "wanted to proceed with Judge McDaniel because she suppressed the evidence in the case."  ***Id***. at 95.  Ultimately, Trial Counsel felt that he "had said [his] peace on the subject," and he "deferred to [Williams'] choice . . . to proceed in a non-jury trial in front of Judge McDaniel." ***Id***. at 98.  Trial Counsel indicated that he "found [Judge McDaniel] to be a rather fair trial judge in a jury trial," and he had no objection to proceeding before her in that manner.  ***Id***. at 93.

When asked why he did not discuss the "new information" with Williams relating to Judge McDaniel's comments during the *in camera* hearing, Trial Counsel testified that he did not do so to "maintain[ his] relationship with . . . Williams" and "proceed in the fashion that he desired."  ***Id***. at 92.  However, Trial Counsel recognized that he "should have motioned for a mistrial after the competency hearing and . . . should have raised [a] recusal motion, at least as early as the post-sentence motion."  ***Id***.  Trial Counsel stated that he instead determined that "accusing [S.S.] was not going to be a fruitful defense" and relied on his other defenses, including that Williams lacked the

specific intent to kill. *Id*. at 90. Trial Counsel stated that he attempted to argue that S.S. was an "alternative suspect" in his closing argument but "Judge McDaniel cut [him] off . . . and advised [him] to change course." *Id*. at 90-91, 110.

Regarding Dr. Arden's expert opinion, Trial Counsel stated that the evidence would have been "helpful" at trial in arguing that Williams lacked the specific intent to kill. *Id*. at 100. Trial Counsel testified that he did not seek to retain an expert for two reasons; first, the trial court had a $2,000 "fee cap" for experts at the time and it "was very difficult to get an expert to crack the file" for that amount. *Id*. at 100-01. Trial Counsel's "overriding" consideration, however, was that he "found it unlikely Judge McDaniel would disbelieve the testimony from the Child Advocacy Center, as she had presided over hundreds of cases involving them by the time [Williams'] case went to trial." *Id*. at 101, 122.

At the conclusion of the hearing, Judge Mariani granted Williams' petition and awarded him a new trial. Judge Mariani found that Judge McDaniel denied Williams' right to a fair trial and infringed on his right to confrontation when she "went too far in accommodating the Commonwealth's princip[al] witness" and "cut off a young lawyer's attempt to defend his client." *Id*. at 125. Judge Mariani further found that Trial Counsel was ineffective because he did not "preserve his client's legal rights and interests in this case." *Id*. While Judge Mariani briefly referenced Trial Counsel's decision to not

pursue an expert witness, he did not expressly rule on Williams' second PCRA claim. *See id*. at 126.

The Commonwealth filed a timely notice of appeal. Judge Mariani retired several days after his ruling, and the matter was reassigned to the Honorable Jennifer Satler. Judge Satler directed the Commonwealth to file a Rule 1925(b) concise statement of errors complained of on appeal, and the Commonwealth complied. Judge Satler filed a Rule 1925(a) opinion in support of Judge Mariani's grant of PCRA relief in favor of Williams.

The Commonwealth raises the following issues on appeal:

I. Did the PCRA court err in awarding [Williams] a new trial because of his counsel's alleged ineffectiveness in failing to object and move for the recusal of the trial court judge based on that jurist's purported bias in favor of the prosecution, where [Williams] had been adamant about being tried before that particular judge regardless of any bias on her part?

II. To the extent that the PCRA court awarded [Williams] a new trial because of counsel's failure to call an expert witness as to the timing and cause of the murder victim's injuries, would that decision also have been error, given that [Williams] failed to establish at the PCRA hearing that his proposed expert could have offered testimony that would even have been of particular benefit to the defense, let alone would have likely resulted in a different outcome at trial?

Commonwealth's Brief at 5.

In its first issue, the Commonwealth argues that the PCRA court erred by finding that Trial Counsel rendered ineffective assistance of counsel based upon his failure to object or move for recusal due to Judge McDaniel's apparent bias. On appeal from the grant of PCRA relief, our review "is limited to

examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Agnew**, 299 A.3d 1001, 1005 (Pa. Super. 2023) (citation omitted). "The PCRA court's factual findings are binding if the record supports them, and we review the court's legal conclusions *de novo*.". **Id**. (citation omitted). We confine our review to the findings of the PCRA court and the evidence of record, which we view in the light most favorable to the party who prevailed below. **See Commonwealth v. Murchison**, 328 A.3d 5, 17 (Pa. 2024).

In assessing an ineffective assistance of counsel claim under the PCRA, we presume that counsel has rendered effective assistance. **See Commonwealth v. Washington**, 269 A.3d 1255, 1263 (Pa. Super. 2022) (*en banc*). To overcome the presumption, the petitioner must show that: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." **Id**. (citation omitted). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. **See id**.

Generally, "counsel cannot be deemed ineffective for failing to override the decisions of his client." **Commonwealth v. Taylor**, 718 A.2d 743, 744 (Pa. 1998). In the context of a decision regarding whether to waive a jury trial, our Supreme Court has concluded that such a "decision . . . is ultimately and solely the defendant's, [and the] defendant must bear the responsibility

for that decision " *Commonwealth v. Boyd*, 334 A.2d 610, 616-17 (Pa. 1975); *see also* Pa.R.P.C. 1.2(a) (providing that a lawyer shall generally "abide by a client's decision concerning the objectives of representation," and specifically in a criminal case "abide by the client's decision, after consultation with the lawyer, as to . . . . whether to waive jury trial"). "Where an appellant merely claims . . . that his decision was a strategic error, and can point to no specific incidents of counsel impropriety, he must bear the responsibility for that decision and cannot shift the blame to counsel." *Boyd*, 334 A.2d at 617 (internal citation omitted).

In *Commonwealth v. Brown*, 477 A.2d 1364 (Pa. Super. 1984), Ernest Brown ("Brown") argued that his trial attorney rendered ineffective assistance by "failing to request recusal of the trial judge since the trial judge ruled against [Brown] at the suppression hearing and was aware that [Brown] had initially intended to plead guilty." *Id*. at 1367. We held that, just as the decision to waive a jury trial is solely the defendant's,

> a decision by the defendant to insist that a particular judge try a non-jury case is also solely the defendant's decision and his counsel will not be deemed to be ineffective as long as the defendant makes the decision to remain before a particular judge with full knowledge of that particular judge's prior involvement coupled with the knowledge that, upon request, he could have another judge hear the case.

*Id*. at 1368. We concluded that, because Brown was aware of the trial judge's role in his case and the judge informed Brown of his right to have another judge conduct his trial, trial counsel was not ineffective. Rather, "trial counsel

- 21 -

was precluded from moving for recusal" under those circumstances, as doing so "would have been contrary to the express wishes of his client." *Id*.

As Judge Mariani found that Judge McDaniel's conduct infringed Williams' due process right to a fair trial and to present an adequate defense and his right to confront the witnesses against him, we review the relevant legal principles. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." *Commonwealth v. Cain*, 29 A.3d 3, 8 (Pa. Super. 2011) (citation omitted). "[T]he appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of either of these elements." *Id*. (citation omitted).

> However, simply because a judge rules against a defendant does not establish any bias on the part of the judge against that defendant. Along the same lines, a judge's remark made during a hearing in exasperation at a party may be characterized as intemperate, but that remark alone does not establish bias or partiality.

*Interest of D.J.B.*, 230 A.3d 379, 385 (Pa. Super. 2020) (citations omitted).

Our Supreme Court "presumes judges of this Commonwealth are 'honorable, fair and competent,' and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice." *Commonwealth v. Druce*, 848 A.2d 104, 108 (Pa. 2004) (citation omitted).

As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make.

*Commonwealth v. White*, 734 A.2d 374, 384 (Pa. 1999) (citations omitted).

"[A] party arguing for recusal need not prove that the judge's rulings actually prejudiced him; it is enough to prove that the reasonable observer might question the judge's impartiality." *Commonwealth v. Rhodes*, 990 A.2d 732, 748 (Pa. Super. 2009) (citation omitted). "[A] party seeking recusal or disqualification on the basis of judicial bias or impartiality must raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Commonwealth v. Fletcher*, 307 A.3d 742, 748 (Pa. Super. 2023) (citation and quotation marks omitted).

A defendant has a fundamental due process right to present a fair and complete defense. *Commonwealth v. Yale*, 249 A.3d 1001, 1012-13, 1020-21 (Pa. 2021). "In *Yale*, our Supreme Court reaffirmed the well-established principle that a defendant has the right 'to present evidence that someone else committed the crime of which he is accused' as the defendant 'should be allowed to prove a fact which would logically produce a doubt of his guilt in the mind of the jury.'" *Commonwealth v. Herring*, 271 A.3d 911, 918 (Pa. Super. 2022) (*quoting* *Yale*, 249 A.3d at 1014). The Court concluded that a

trial court should evaluate a defendant's evidence tending to show a third party committed the charged crimes under "the traditional inquiries prompted by our rules of evidence," rather than the heightened standard otherwise applicable to bad-act evidence. *Yale*, 249 A.3d at 1021-22 (*citing* Pa.R.E. 401, 403, 404(b)).

The Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution each guarantee the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const., Amend. 6; *see also* Pa. Const., Art. I, § 9; *Commonwealth v. Lamont*, 308 A.3d 304, 309 (Pa. Super. 2024) (noting that "the Pennsylvania Constitution provides a criminal defendant with the same protection as the Sixth Amendment"). "[A]lthough the Confrontation Clause . . . reflects a preference for face-to-face confrontation, face-to-face confrontation is neither an absolute nor an indispensable requirement." *Commonwealth v. Williams*, 84 A.3d 680, 684 (Pa. 2014) (*citing* *Maryland v. Craig*, 497 U.S. 836, 844-50 (1990)). Rather, "the preference for face-to-face confrontation must give way" when "necessary to further an important public policy," such as to prevent a child witness from suffering "serious emotional distress" by testifying in open court. *Id*. at 684-85 (citation omitted). Thus, Pennsylvania has enacted legislation that permits a "child victim or child material witness" in a criminal case to testify from another room via a "contemporaneous alternative method" following a finding that face-to-face testimony would cause the child serious emotional distress. 42 Pa.C.S.A. § 5985(a); *see also*

*Williams*, 84 A.3d at 682-83 (noting that Section 5985 is consistent with the federal and Pennsylvania Confrontation Clauses).

On appeal, the Commonwealth first notes that Trial Counsel's own testimony at the PCRA clearing "made quite clear that Williams was adamant not only about proceeding with a non-jury trial but proceeding non-jury *in front of Judge McDaniel in particular*[.]"  Commonwealth's Brief at 29 (emphasis in original).  The Commonwealth points out that Williams made this decision, notwithstanding that Judge McDaniel heard his suppressed statements and informed him that he could proceed before a different judge and Trial Counsel's repeated advice to Williams that he should not proceed before Judge McDaniel.  Therefore, the Commonwealth submits that if Trial Counsel had "request[ed] . . . a mistrial and recusal," that decision "would have been acting against Williams' express wishes."  *Id*. at 30.

To the extent Judge Mariani found that Trial Counsel's performance was deficient because he let "his client . . . dictate how this case was handled," the Commonwealth argues that this conclusion was erroneous.  *Id*. (*quoting* N.T., 3/28/24, at 125).  Rather, the Commonwealth observes that our caselaw has repeatedly made clear that "defense counsel will not be deemed to be ineffective for respecting their clients' wishes."  *Id*. at 30-31.  The Commonwealth draws our attention to our decision in *Brown*, wherein we rejected an ineffectiveness claim based on the failure to seek recusal of the trial judge the defendant wanted to preside over his non-jury trial.  The Commonwealth avers that *Brown* established that a trial attorney "not only

could not be deemed ineffective for having failed to seek the trial court's recusal" in such a scenario "but that counsel was actually precluded under the law from doing so, as seeking recusal under those circumstances 'would have been contrary to the express wishes of his client.'" *Id*. at 34 (*quoting **Brown***, 477 A.2d at 1368).

The Commonwealth asserts that in the instant case, the record established that Trial Counsel spoke to Williams regarding Judge McDaniel's alleged bias in child abuse cases[6] and Judge McDaniel herself informed Williams that he could proceed before a different judge if he elected to do so. Therefore, the Commonwealth contends that Trial Counsel "certainly should not have been deemed ineffective for having failed to override his client's insistence that he be tried before Judge McDaniel, as the caselaw strictly forbade him from doing so." *Id*. at 35. The Commonwealth maintains that this result "makes perfect sense . . . because any contrary [holding] would allow someone in Williams' position to have it both ways" and "claim ineffectiveness if his trial attorney both **did** and **did not** honor his wishes." *Id*. (emphasis in original).

Thus, the Commonwealth maintains that Williams' ineffectiveness claim was "unworthy of relief because" Trial Counsel "was not even permitted to

---

[6] We note that the instances of Judge McDaniel's bias noted by this Court in prior cases related only to the sentencing of individuals who committed **sexual** abuse against a child, not the purely **physical** child abuse at issue in this case. **See McCauley**, 199 A.3d at 951. This distinction is immaterial to our disposition of this matter, however.

request [Judge McDaniel's recusal] under the law given Williams' insistence that he be tried before" her. *Id*. at 36-37. However, the Commonwealth asserts that his "claim had another flaw that was similarly ignored by the PCRA court:" "there was . . . no real reason to believe that S.S. wanted to — or did — kill his little brother." *Id*. at 37. The Commonwealth avers that the alleged video discussing S.S.'s sexual abuse of J.S. and S.S.'s confessions in his personal notebook about not being a good older brother fail to "establish[] a motive for S.S. to have killed J.S." *Id*. The Commonwealth further contends that "the record is completely devoid of evidence that would indicate that S.S. even had the opportunity to do so on the date in question." *Id*. at 37-38.

Finally, the Commonwealth notes that Trial Counsel "actually did make the case for S.S. being the perpetrator of the crime" during his closing argument, contradicting Trial Counsel's PCRA testimony that "Judge McDaniel cut [him] off . . . and advised [him] to change course." *Id*. at 38 & n.15 (*quoting* N.T., 3/28/24, at 110). However, according to the Commonwealth, Trial Counsel "seemed to not believe that theory of the case himself, saying — twice — 'I'm not suggesting that this is the most likely possibility[.]'" *Id*. at 38 (*quoting* N.T., 11/30/17, at 319). The Commonwealth claims that "[i]f Williams' own attorney did not believe that the evidence supported the theory that S.S. was the one who inflicted the fatal head injury upon the victim . . ., it is difficult to see how Williams has established that the outcome of his trial would have been different even if [Trial C]ounsel could have successfully

obtained Judge McDaniel's recusal and had the matter tried before a different jurist." *Id*. at 39.

Judge Mariani announced his findings and award of a new trial to Williams at the conclusion of the PCRA hearing:

> . . . [Q]uoting . . . from the U.S. Supreme Court in [**Williams v. Pennsylvania**, 579 U.S. 1, 14 (2016), t]here's a ["]structural error["] in the trial, and [Williams] is entitled to relief.
>
> I don't do this lightly. . . . I have known Judge McDaniel . . . for over 40 years. I know she always meant to do the right thing, but I think she conducted this case in a way that was inappropriate for a judge to do.
>
> * * * *
>
> . . . [I]n this non-jury trial, she went too far in accommodating the Commonwealth's princip[al] witness. She cut off a young lawyer's attempt to defend his client.
>
> I do not agree with [Trial Counsel] that his client should dictate how this case was handled, even though . . . Williams stubbornly fought with his lawyer and accused him of not doing the right thing and was going to fire him . . ..
>
> Even assuming all that, [Trial Counsel] had the duty, as the lawyer of record, to preserve his client's legal rights and interests in this case.
>
> * * * *
>
> . . . [I]n th[is] case, I don't think [Trial Counsel] acted appropriately. And he was, in my view, maneuvered, I will say, by the Judge, not with any ill intent on anybody's part.
>
> The fact is, . . . Judge [McDaniel] was the fact finder in this case. I think it's inappropriate for her to have brought that witness into chambers. And whether or not a competency hearing can be done outside the presence of the defendant, even in a non-jury case, I find that problematic. . . .
>
> But it got worse than that because . . . Judge [McDaniel] permitted another person to instruct the princip[al] witness not to

even look at [Williams], so his right of confrontation was doubly harmed at that point in time.

But the rest of the trial, including the defense of [S.S.] potentially having done this, [Trial Counsel] not pursuing an expert witness because of the constraints of the expense of doing so, . . . [Williams] is entitled to a new trial.

N.T., 3/28/24, at 124-26.

In her Rule 1925(a) opinion, Judge Satler provided the following reasoning in support of Judge Mariani's grant of PCRA relief to Williams:

Judge Mariani clearly believed that [T]rial [C]ounsel should have moved for a mistrial and/or ask Judge McDaniel recuse herself as a result of her behavior toward S.S. He clearly believed that [T]rial [C]ounsel did not pursue the theory that S.S. was the actual perpetrator in this case because of the manner in which Judge McDaniel protected S.S. during the trial. Judge Mariani also believed that [T]rial [C]ounsel did not seek a mistrial or recusal of Judge McDaniel for the same reason. Judge Mariani must have believed that Judge McDaniel's conduct demonstrated partiality toward a critical Commonwealth witness such that Judge McDaniel should not have presided over the non-jury trial. Additionally, Judge Mariani necessarily found fault with [T]rial [C]ounsel's failure to object to Judge McDaniel's behavior and that his failure to act amounted to legally deficient legal representation.

PCRA Court Opinion, 11/6/24, at 10-11.

After careful review and viewing the evidence in the light most favorable to Williams, we conclude that the record does not support Judge Mariani's conclusion that Trial Counsel was ineffective for not seeking Judge McDaniel's removal on the grounds of her alleged bias. *See Murchison*, 328 A.3d at 17. Initially, we agree with the Commonwealth that Trial Counsel was not ineffective for not immediately raising a claim of judicial bias during the *in camera* hearing. As Trial Counsel explained during his PCRA hearing

testimony, he advised Williams prior to trial to not proceed before Judge McDaniel because of her perceived bias against defendants in child abuse cases and the fact that she heard his suppressed statements. ***See*** N.T., 3/28/24, at 95, 98. Indeed, Trial Counsel's insistence that Williams go before a jury or a different jurist led Williams to request that Trial Counsel file a motion to withdraw from representing him.

Because Williams had full knowledge of Judge McDaniel's prior involvement in his case and she advised him that he could request that another jurist hear his case, his "decision . . . to insist that [Judge McDaniel] try [his] non-jury case [was] solely [his] decision and [Trial C]ounsel will not be deemed to be ineffective" for not overriding his client's decision. ***Brown***, 477 A.2d at 1368; ***see also Taylor***, 718 A.2d at 744 (stating that generally "counsel cannot be deemed ineffective for failing to override the decisions of his client"); N.T., 9/11/17, at 3-4 (Judge McDaniel advising Williams that he could elect to have a different jurist consider his claim); N.T., 11/28/17, at 10 (same). Indeed, Trial Counsel was ethically bound to "abide by [his] client's decision concerning the objectives of representation," including his decisions relating to his jury trial waiver. Pa.R.P.C. 1.2(a); ***see also Brown***, 477 A.2d at 1368 (concluding that defense counsel may not move for a judge's recusal when it is "contrary to the express wishes of his client").

The question remains, however, whether Trial Counsel rendered deficient performance by not advising Williams immediately after the *in camera* hearing to move for a mistrial or otherwise object to Judge McDaniel's

conduct based on the "new information" he learned during the hearing.[7]  N.T., 3/28/24, at 92.  We conclude that he did not.

First, we find distinguishable **Williams v. Pennsylvania**, the case upon which Judge Mariani relied to find that Judge McDaniel's conduct amounted to "structural error."  N.T., 3/28/24, at 124.  The issue before the United States Supreme Court in that case was whether a due process violation occurred when former Chief Justice Ronald Castille of our Supreme Court participated in the adjudication of a PCRA petition brought by a capital offender, whose death penalty prosecution Chief Justice Castille approved when he served as the District Attorney of Pennsylvania.  **See Williams**, 579 U.S. at 4-8.  The High Court held that Chief Justice Castille's "failure to recuse constitute[d] structural error" because he had a "significant, personal involvement in a critical decision in [the petitioner's] case[, which] gave rise to an unacceptable risk of actual bias[.]"  **Id**. at 14.  Here, by contrast, there was no structural error as Judge McDaniel had no personal involvement in Williams' case aside from her role as the jurist presiding over the non-jury trial.

_____

[7] Williams asserts that Trial Counsel could have deferred raising Judge McDaniel's bias until his post-sentence motion under "the relaxed . . . waiver rule" pertaining to this issue.  Williams' Brief at 42.  This is not so.  A claim of "[j]udicial bias may not be raised for the first time during post-trial proceedings."  **Commonwealth v. Fletcher**, 307 A.3d 742, 748 (Pa. Super. 2023) (citation omitted).  "On the contrary, a party seeking recusal or disqualification on the basis of judicial bias or impartiality must raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred."  **Id**. (citation, brackets, and quotation marks omitted).

Second, we disagree with Judge Mariani's conclusion that Judge McDaniel "went too far in accommodating" S.S. during the *in camera* hearing. N.T., 3/28/24, at 125. Trial Counsel himself recognized that it is not "uncommon" for a judge in Allegheny County — or indeed, the remaining counties of this Commonwealth — to engage in "banter with the child before a competency hearing to make him feel comfortable." *Id*. at 78. Rather than showing an inappropriate partiality towards S.S., Judge McDaniel's conduct at the *in camera* hearing — complimenting his hairstyle, discussing his order in the list of witnesses, giving him candy, and allowing him to use her chambers as a waiting room — was clearly for the purpose of ensuring that fourteen-year-old S.S. was comfortable testifying against his stepfather. We similarly conclude that Judge McDaniel's statement to S.S. that "there [would] be a policeman in the [court]room" while he testified evinced the court's efforts to reassure S.S. that he would be safe during his testimony and did not show that she had already prejudged Williams' guilt. N.T., 11/29/17, at 118.

Third, we are unpersuaded that S.S.'s aunt instruction to S.S. to not "even look at" Williams while testifying violated Williams' Confrontation Clause rights. *Id*. at 117. The Confrontation Clause "reflects a preference for face-to-face confrontation," but there is no requirement that a witness look a defendant in the eyes while testifying. *Williams*, 84 A.3d at 684; *see also Coy v. Iowa*, 487 U.S. 1012, 1019 (1988) (stating, "The Confrontation Clause does not . . . compel the witness to fix his eyes upon the defendant"). Moreover, the face-to-face requirement is not "absolute" and "must give way"

when public policy dictates, such as where a child witness would suffer "serious emotional distress" from testifying in open court. *Id*. at 684-85 (citation omitted). While Judge McDaniel did not authorize S.S. to testify through a contemporaneous alternative method in this case, we observe that this option was at the court's disposal if the court made the appropriate finding of serious emotional distress. *See* 42 Pa.C.S.A. § 5985(a) (providing that the trial court may permit testimony by alternative method "in any prosecution . . . involving . . . a child material witness"). In the instant case, where S.S. testified under oath, in open court and in Williams' presence, and submitted to cross-examination from defense counsel, Williams' Confrontation Clause right remained inviolate.

Fourth, upon a thorough review, we find that the record does not support Judge Mariani's conclusion that Judge McDaniel "cut off [Trial Counsel's] attempt to defend his client" by arguing S.S. as an alternate suspect who could have caused J.S.'s death. N.T., 3/28/24, at 125. Judge McDaniel permitted Trial Counsel to cross-examine S.S. regarding his admission in his rap notebook that he punched J.S. two days before he died, as well as to ask whether he "harmed [J.S.] in any other way other than punching[.]" N.T., 11/29/17, at 123-24, 211. The only line of questioning that Judge McDaniel precluded was Trial Counsel's inquiry into S.S.'s alleged sexual abuse of J.S., which was premised off J.S.'s alleged statement on a video recording on a thumb drive that Trial Counsel received mid-trial and was never able to successfully play. *See id*. at 120, 123-24; *see also* N.T.,

11/30/17, at 313. Furthermore, contrary to Trial Counsel's PCRA hearing testimony, Trial Counsel did in fact argue in closing — without interruption from Judge McDaniel — that S.S. was "a suspect in causing the injury" to J.S. N.T., 11/30/17, at 319-20.

Therefore, the record reveals that Judge McDaniel permitted Trial Counsel to present his defense that S.S. was an alternate suspect and cross-examine him regarding any abuse of J.S., except as to sexual abuse allegations that lacked any foundation. We detect no error in the court's rulings nor do we find them indicative of bias against Williams or in favor of S.S. While Judge McDaniel indicated during the *in camera* hearing that the evidence showed that S.S. "was not the abuser" and she did not want to "hurt this kid again," she clarified she was offering only a preliminary assessment based only upon the evidence presented at trial "***thus far***." N.T., 11/29/17, at 123 (emphasis added). In any event, we do not find that these isolated "intemperate" remarks by themselves sufficient to vacate Williams' convictions and order a new trial. ***Interest of D.J.B.***, 230 A.3d at 385.

Finally, we observe that the record is devoid of any evidence that, even if Trial Counsel had urged his client to object to Judge McDaniel's *in camera* comments or to seek a mistrial, Williams would have supported such a decision. Crucially, Williams did not testify at the PCRA hearing. In light of his earlier insistence that Judge McDaniel try him — notwithstanding Trial Counsel's advice to the contrary based on her alleged bias in similar cases and knowledge of the suppressed statements — we cannot assume that Williams

would have agreed to switch course in the middle of trial and seek Judge McDaniel's removal. Accordingly, in light of the foregoing, we conclude that the record does not support the PCRA court's ruling that Trial Counsel rendered ineffective assistance by failing to object to Judge McDaniel's conduct or move for a mistrial, and therefore the court erred by granting Williams relief of a new trial. *See Agnew*, 299 A.3d at 1005.

In its second issue, the Commonwealth argues that Trial Counsel was not ineffective based on his failure to retain a medical expert to counter the Commonwealth's theory of the case. As noted above, Judge Mariani only briefly referenced Trial Counsel's decision to not procure an expert when issuing his findings and did not grant Williams PCRA relief on that basis. Judge Satler likewise did not reach the issue of whether PCRA relief was due on this claim. While we could remand to allow the PCRA court to address the claim in the first instance, we review this claim in the interest of judicial economy.

We apply the following standards to this ineffectiveness claim:

> To prove arguable merit based on trial counsel's failure to call a witness, a PCRA petitioner must show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice. In this context, prejudice means that the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. Thus, if the proposed testimony would have been helpful to the defense, then there is arguable merit.

*Commonwealth v. Robinson*, 278 A.3d 336, 343 (Pa. Super. 2022) (citations, brackets, and quotation marks omitted). In addition to

demonstrating that the uncalled witness "would have been helpful to the defense" to meet the arguable merit prong, the petitioner must also satisfy the prejudice prong of the ineffectiveness standard. *Id*. at 343, 348. That is, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 348 (citation omitted).

The Commonwealth argues that there was no arguable merit to the claim that Trial Counsel was ineffective for not calling a medical expert because the testimony of the proposed expert, Dr. Arden, would not have been helpful to the defense. *See id*. at 460. The Commonwealth asserts that Dr. Arden sought to undermine the Commonwealth's theory of the case in two respects: (1) by arguing that the injury occurred closer in time to when Williams and Mother drove J.S. to the hospital, negating the finding of specific intent to kill premised partly on a delay in seeking medical treatment; and (2) by challenging the mechanism of J.S.'s injuries as a result of rapid acceleration and deceleration of J.S.'s head. The Commonwealth argues that Dr. Arden's testimony was not successful in either respect. Regarding the timing of the injury, the Commonwealth avers that although Dr. Arden initially stated that J.S. could not have walked from his bedroom to S.S.'s bedroom after receiving violent blows to the head and he would have necessarily left blood and vomit in S.S.'s bedroom, "he retreated from [those] position[s] on cross-examination by the Commonwealth[.]" Commonwealth's Brief at 47. The Commonwealth contends that Dr. Arden's testimony that J.S.'s condition

would have been immediately apparent to an observer, particularly his difficulty breathing, was in fact consistent with Mother's and S.S.'s testimony that J.S. was snoring loudly and appeared to be congested.

With respect to Dr. Arden's opinion on the cause of J.S.'s death, the Commonwealth contends that the expert "seem[ed] to have misinterpreted exactly what [the Commonwealth's] theory was." *Id*. at 48. The Commonwealth submits that its trial experts did not testify that rapid acceleration and deceleration alone caused J.S.'s brain injuries, nor did they mention shaken baby syndrome during their testimony. Rather, the Commonwealth's experts, Dr. Clarke and Dr. Luckasevic, each testified that J.S.'s injuries were caused by a backward and forward motion of J.S.'s head coupled with an impact of J.S.'s head against some object. Thus, the Commonwealth asserts that "the testimony of Dr. Arden, had it been offered in the trial court alongside that of the Commonwealth's experts, would have added nothing of consequence with regard to" the timing or the cause of J.S.'s injuries. *Id*. at 49.

The Commonwealth further argues that, even assuming there would have been "some marginal benefit" to calling Dr. Arden, Williams did not prove prejudice as he did not show that "there was a reasonable probability of a different outcome at trial" if Dr. Arden had testified. *Id*. at 52 (citation omitted). The Commonwealth maintains that "the substance of Dr. Arden's testimony was of very little consequence" for the reasons previously stated, and particularly in light of the other evidence at trial, including Mother's and

S.S.'s testimony regarding the sequence of events and Williams' contradictory statements to police. The Commonwealth asserts that in light of the strong evidence of guilt and minimal benefit of Dr. Arden's testimony, "any decision by the PCRA court to award Williams a new trial based on his counsel's failure to call an expert witness would have been error and must be reversed[.]" *Id*. at 53.

Based upon our careful review of the record, we conclude that Williams failed to prove that the result of his trial would have been different if Trial Counsel had called a medical expert to testify consistent with Dr. Arden's testimony at the PCRA hearing. *See Robinson*, 278 A.3d at 348. Concerning the timing of J.S.'s injuries, Dr. Arden initially testified that J.S. would have been immediately symptomatic after the assault and could not have walked at all, but he later agreed with Dr. Luckasevic "it [wa]s possible that [J.S.] could have ambulated a little bit shortly after the injury had been sustained." N.T., 3/28/24, at 15-16, 28; *see also* N.T., 11/30/17, at 302, 307 (Dr. Luckasevic testifying that J.S. could have ambulated several feet for several minutes after sustaining the injuries); N.T., 11/28/17, at 37 (Detective Fitzgerald testifying that "[a]pproximately five and a half feet or so" separated J.S.'s and S.S.'s bedrooms). Dr. Arden also conceded that, while it was more likely that J.S. would have vomited in S.S.'s bedroom, "it [was] possible that he could have vomited in one of the rooms and not the other[.]" N.T., 3/28/24, at 16, 26-27.

Additionally, as the Commonwealth points out, Mother's and S.S.'s testimony that J.S. sounded congested and was snoring loudly to the point that S.S. remarked on this fact to Mother was consistent with Dr. Arden's testimony that J.S. would not have appeared "normal." *Id*. at 18-19; *see also* N.T., 11/28/17, at 69 (Mother testifying that J.S. was "snoring" and "sounded congested" when she observed J.S. after arriving home from her cleaning job); N.T., 11/29/17, at 193 (S.S. testifying that, when he discovered J.S. in his bed, J.S. was "snoring loudly" and S.S. then went downstairs and told Mother that S.S. was "snoring loud"). Dr. Clarke's testimony supported the observation that J.S. may have presented as sounding congested or having shallow or difficult breathing in the minutes after his head trauma. *See* N.T., 11/30/17, at 275, 281-82. Therefore, in light of the additional evidence supporting the theory that Williams injured J.S. during the period when Mother and S.S. were out on Mother's cleaning job — including the testimony that it was uncommon for J.S. to be sleeping in S.S.'s bed, J.S.'s clothes were wet, and Williams moved J.S. back to his bedroom — we conclude that there was not a reasonable probability that Dr. Arden's testimony would have altered Judge McDaniel's finding regarding the timing of the injuries. *See Robinson*, 278 A.3d at 348.

With respect to Dr. Arden's opinion regarding the cause of J.S.'s fatal injury, his disagreement focused on the Commonwealth's experts' discussion of acceleration and deceleration forces on J.S.'s brain, which Dr. Arden interpreted as an allusion to shaken baby syndrome. *See* N.T., 3/28/24, at

20-21. Dr. Arden indicated that J.S.'s subdural hemorrhage was instead the result of "an impact mechanism" resulting from multiple blows to the head. *Id*. at 21, 25. However, neither of the Commonwealth's experts referenced shaken baby syndrome during their testimony, nor did they opine that the mere act of shaking J.S. led to the subdural hemorrhage that caused his death. Rather, both experts also attributed J.S.'s injuries to impact. Dr. Clarke testified that J.S.'s injuries were caused by "multiple forward and backward movements ***plus impact***." N.T., 11/30/17, at 277 (emphasis added). Dr. Luckasevic described significant bruising and wounds to J.S.'s head, caused by his "head striking a blunt object or a blunt object striking [his] head." ***Id***. at 310-12. Dr. Luckasevic indicated that the "multiple blows" caused "impact and sudden stop" forces to J.S.'s head that resulted in the subdural hemorrhage. ***Id***. at 311-12. Therefore, as the Commonwealth's experts attributed J.S.'s injuries to impact, and Dr. Arden's opinion regarding the shaken baby syndrome appears to be based on a misunderstanding of the Commonwealth's experts' testimony, Williams did not demonstrate that a defense expert's testimony would have altered the determination as to the mechanism of J.S's injuries. ***See Robinson***, 278 A.3d at 348.

Accordingly, we conclude that the record does not support the finding that Trial Counsel rendered ineffective assistance for not calling a medical expert. Furthermore, we find that the record does not support the PCRA court's determination that Trial Counsel was ineffective for not objecting to

Judge McDaniel's perceived bias and the PCRA court erred in so concluding.

We therefore reverse the grant of PCRA relief to Williams.

Order reversed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/24/2025